IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JONPAUL GOMORI, | CASE NO. 4:21-CV-401 |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT & RECOMMENDATION** |
| Defendant. | |

Plaintiff, Jonpaul Gomori ("Plaintiff" or "Gomori"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

On September 18, 2018, Gomori filed applications for POD, DIB, and SSI, alleging a disability onset date of August 21, 2018 and claiming he was disabled due to back injury, bipolar disorder, arthritis in back from surgery, degenerative disc disease, sciatica, and radiculopathy going down left leg.  Transcript ("Tr.") at 12, 255, 263, 298.  The applications were denied initially and upon reconsideration, and Gomori requested a hearing before an administrative law judge ("ALJ").  Tr. 173.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On May 8, 2020, an ALJ held a hearing, during which Gomori, represented by counsel, and an impartial vocational expert ("VE") testified. Tr. 49-96. On June 11, 2020, the ALJ issued a written decision finding that Gomori was not disabled. Tr. 12-43. The ALJ's decision became final on December 18, 2020, when the Appeals Council declined further review. Tr. 1-3. On February 19, 2021, Gomori filed his Complaint to challenge the Commissioner's final decision. Doc. No. 1. He asserts the following assignment of error:

> After Step Three and prior to Step Four, the ALJ assessed a physical RFC finding that is unsupported by substantial evidence due to erroneous failure to develop the record with updated opinion evidence.

Doc. No. 13, p. 3. The parties have completed briefing in this case. Doc. Nos. 13, 15, 16.

## II. EVIDENCE

**A.      Personal and Vocational Evidence**

Gomori was born in 1980 and was 38 years old on his alleged disability onset date. Tr. 38. He has at least a high school education and has past work as a cable television line technician. Tr. 38.

**B.      Relevant Medical Evidence[2]**

On April 5, 2018, Gomori had a lumbar MRI which, compared to a 2015 MRI, showed interval laminectomy changes at L4-L5 and L5-S1, including canal decompression, and there remained encroachment on the L5 and S1 nerve roots and neural foraminal narrowing. Tr. 487. Disc protrusions at L2-L3 and L3-L4 were improved with residual stenosis. Tr. 487.

On May 7, 2018, Gomori saw Physician's Assistant Craig Morrison for his lumbar spondylosis. Tr. 470. He reported that he had had a lumbar laminectomy in 2015 and that he experienced back pain, although he had no pain on the day of his visit. Tr. 470. Upon exam, he had normal strength, sensation, range of motion, and reflexes in his arms and legs, displayed no muscle atrophy, and had a normal gait,

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

muscle tone, and coordination. Tr. 470. The treatment note reads, "He has no restrictions. He has completely recovered from his lumbar laminectomy." Tr. 471.

On May 21, 2018, Gomori saw Physician's Assistant Steven Humansky at pain management for upper arm pain and low back pain. Tr. 391. He reported that the pain radiating down his left leg to his foot and he had had associated numbness, tingling and weakness for the last 5 years. Tr. 391. It was made worse with bending and twisting and he described the pain as continuous, achy, sharp, and miserable. Tr. 391. He was currently taking Tylenol and requested pain medication. Tr. 391. Upon exam, he had full strength, a normal gait, sensation, and reflexes, paraspinal tenderness on the left, and positive straight leg raise testing on the left. Tr. 392-393. He was prescribed nabumetone, left-sided facet blocks were ordered, and he was encouraged to continue a low velocity home exercise routine and physical therapy. Tr. 393.

On June 26 and July 3, 2018, Gomori had left-sided facet block injections. Tr. 387, 389.

On August 17, 2018, Gomori saw Humansky for a follow-up. Tr. 383. He reported having 80% relief from the facet blocks. Tr. 318. His medication wasn't helping and he wanted to try radiofrequency ablation. Tr. 383. Upon exam, he had bilateral paraspinal tenderness to palpation, positive straight reg raise testing on the left, full strength, a normal gait, sensation, and reflexes, and positive facet provocation maneuvers produced pain bilaterally. Tr. 384. He was prescribed oxaprozin and, on September 10, he had radiofrequency neurolysis on the left at L3 through S1. Tr. 381, 385.

On August 20, 2018, Gomori went to the ER after hurting his back and leg while digging. Tr. 414, 430. He reported sharp, radiating pain down his left leg and some numbness. Tr. 414, 431. He denied weakness or the inability to walk and stated that he thought it was an overuse injury from work. Tr. 414. Upon exam, he had intact reflexes, motor strength, and sensation and a positive straight leg raise test on the left. Tr. 415. He was treated with steroids and muscle relaxers, discharged, and ordered

3

to follow up with his worker's compensation doctor. Tr. 417.

On August 8, 2018, Gomori saw Family Nurse Practitioner Doug Sprosetta for radiating back pain and said that he had a very active construction job that made his pain worse. Tr. 448. He reported occasional weakness and trouble finding a comfortable position. Tr. 448. Upon exam, he had a decreased range of motion in his lumbar spine due to stiffness and pain and negative straight leg raise testing. Tr. 449. He was to follow up with his surgeon. Tr. 449.

On October 9, 2018, Gomori saw Andrea VanEstenberg, Ph.D., for a psychological consultative examination. Tr. 459. With respect to his physical impairments, he reported that in July and August 2018 he was working as a signalman at a railway, but after the training period ended he couldn't keep up with the physical demands of the job; "I was in so much pain. They had me shoveling and things my back just couldn't keep up with." Tr. 460. He did not understand why his back was getting worse. Tr. 459. Upon exam, he walked with a limp. Tr. 461. He expressed increased irritability due to back pain. Tr. 462. He had no desire to leave the house and mostly stayed on the same level of the house that his bed was on because he could not walk. Tr. 461.

On December 5, 2018, Gomori saw Morrison and reported 9 months of daily back pain, which had gradually worsened, and which traveled down his left leg. Tr. 478. His treatment (medication, injections, physical therapy) provided mild relief. Tr. 478. Upon exam, he had pain with range of motion of his lumbar spine and with palpation and he had an abnormal gait. Tr. 478.

On March 21, 2019, Gomori saw his surgeon, Kene Ugokwe, M.D. Tr. 534. Dr. Ugokwe reviewed his MRI, which he described as showing severe bilateral foraminal stenosis at L4-L5 and L5-S1. Tr. 534. Upon exam, he had normal reflexes and sensation. Tr. 534. Dr. Ugokwe wrote that Gomori had failed epidurals and physical therapy and recommended fusion surgery to decompress his nerve roots. Tr. 534.

On May 22, 2019, Gomori saw Dr. Ugokwe. Tr. 593. Upon exam, he had normal musculoskeletal range of motion and no swelling, tenderness, or deformity. Tr. 594. He had normal muscle strength and reflexes and displayed no muscle atrophy. Tr. 594. He had a normal gait and coordination. Tr. 594. On May 23, Gomori had fusion surgery at L4 through S1. Tr. 590.

On May 27, 2019, Gomori had an MRI that showed normal vertebral body height and alignment, herniations causing mild-to-moderate stenosis at L2-L4 with mild neuroforaminal narrowing at L3-L4, and postsurgical changes with interpedicular screws at L4-L5 and L5-S1. Tr. 564. On May 28, he had normal strength and sensation in his arms and legs and was discharged with no apparent complications. Tr. 590-591. He was to avoid lifting 10 pounds and bending, twisting, or turning at the waist. Tr. 591.

On June 20, 2019, Gomori saw Morrison at Dr. Ugokwe's office for a follow-up. Tr. 538. He denied leg pain and had normal movement in his arms and legs. Tr. 538. An x-ray was stable and his restrictions were continued. Tr. 538.

On August 5, 2019, Gomori had a counseling appointment and was using a walker. Tr. 522.

On August 6, 2019, Gomori went to the ER after he slipped in the shower and fell, hitting his back on the top of the bathtub. Tr. 495. He had severe, persistent pain, worse with movement. Tr. 495. Upon exam, he appeared uncomfortable and had some minimal tenderness to palpation along the midline of the lumbar thoracic spine. Tr. 497. A CT scan showed a new fracture at the L2 level resulting in 20% loss of vertical dimension of the anterior and middle portion of the vertebral body and preservation of the posterior column. Tr. 500-501. He was to follow-up with Dr. Ugokwe the next day. Tr. 497. The next day he reported no new radicular pain or weakness and he had normal movement in his arms and legs. Tr. 540. He ambulated with a walker and wore his lumbar brace. Tr. 540.

On September 5, 2019, Gomori had a counseling appointment and it was noted that he had gait abnormalities and reported chronic pain. Tr. 520.

On September 30, 2019, Gomori was brought to the emergency room based on statements he had made about using a gun on himself and the pain management clinic after he had become upset when his insurance company declined to pay for his pain medications. Tr. 631. His history of bipolar disorder, recent emotional/personal stressors, chronic back pain, and recent surgery were noted. Tr. 631.

On October 16, 2019, Gomori had a follow up at Dr. Ugokwe's office. Tr. 544. He complained of back and radicular pain and was not taking any medication for his pain. Tr. 544. Upon exam, he was in no distress and had normal movement in his arms and legs. Tr. 544. He was to continue wearing his brace for the next three weeks and encouraged to walk. Tr. 544. Lumbar x-rays were ordered and showed stable fusion spacers and proper alignment at the L4-L5 and L5-S1 levels and moderate degenerative disc space disease at T12-L1 and L1-L2 without significant change in the interim (compared to Gomori's June 2019 x-rays). Tr. 571-572.

Gomori was charged with making terroristic threats and was incarcerated for about three months. Tr. 57. He was assigned to a lower bunk and prescribed pain medication (meloxicam, Tylenol, Motrin). He had paraspinal tenderness in November 2019 and was observed to have an abnormal gait in January 2020. Tr. 714, 715, 722, 739.

On March 12, 2020, Gomori saw a certified nurse practitioner for anxiety. Tr. 684. Upon exam, he had a normal gait and station and normal muscle strength and tone. Tr. 686.

C.     **State Agency Reports**

On October 12, 2018, Bradley Lewis, M.D., reviewed Gomori's record and, regarding his RFC, found that Gomori could perform light work (lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, stand/walk and sit for no more than 6 hours in an 8-hour workday); could frequently climb ramps and stairs and crawl; and could occasionally climb ladders, ropes, or scaffolds, stoop, and crouch. Tr. 104-105. On January 23, 2019, Maria Congbalay, M.D., affirmed Dr. Lewis' opinion. Tr.

130-132.

D. **Hearing Testimony**

During the telephonic May 8, 2020 hearing, Gomori testified to the following:

- He lives in a house with his uncle and his uncle's girlfriend. Tr. 57-58. He has lived there since he was released from prison, and prior to that he lived in a house with his wife and children. Tr. 57-58. He does a little bit of driving "here or there," such as to the grocery store. Tr. 58. Driving is difficult due to sitting and twisting to look out the window or in rearview or side mirrors. Tr. 58-59.

- He had been working as a line technician for a telephone and cable company. Tr. 59. When asked what prevented him from working now, he answered, "just a lot of pain." Tr. 61. He rated his pian 6-7/10. Tr. 61. He can't really bend, lift or twist; to get something off the ground he has to get into a lunge position. Tr. 61. He is okay standing up for a "little bit" and he will start to walk but he gets swelling in his legs and has to lie down and elevate his foot. Tr. 61-62, 73. He had a blood clot in his left leg after back surgeries. Tr. 62. He also wears compression socks to keep his leg swelling down. Tr. 62, 73.

- He is not on pain medication because he is in a court-sponsored mental-health program and is not permitted to take opiates. Tr. 62. He uses lidocaine patches, over-the-counter medication, and a TENS unit, which he uses a few times a day or week depending on how bad his pain is. Tr. 63. His pain is worse when rains and depended on how much he had been on his feet. Tr. 63. He estimated that he could stand 45 minutes to 1 hour and walk ¼ mile before having to sit. Tr. 63-64. He has a prescription for physical therapy but can't start it due to the Covid shutdowns and he does not do exercises. Tr. 64.

- When asked if his symptoms had improved prior to his fall or if they were the same, he stated, "they're really the same. The fall just kinda made the pain kinda go upwards in my back." Tr. 64. His surgeon told him that, depending on how his L2 fracture healed, he will possibly need fusion surgery from T12 all the way down to S1. Tr. 64-65. Since his surgery he has lost 70 pounds, but it hasn't really helped with his pain. Tr. 65. It maybe has decreased his pain from 6-7 to 5-6. Tr. 65. When asked about his diagnoses of radiculopathy and sciatica, he stated that he feels it in both legs, but mainly in the left; he feels it in his right buttock area and all the way down to his left toes. Tr. 65.

- When asked if he helped with household chores, he answered, "not really." Tr. 70. He may separate laundry. Tr. 70. He uses a grabbing stick to pick things up off the ground. Tr. 70-71. He tries not to lean forward and to keep his back as straight as possible, because leaning forward makes the pain go down his back and into his legs. Tr. 71. The problem also makes it hard to sit; he can sit for about 10-15 minutes in a padded chair. Tr. 71. Then, he feels numbness behind his kneecaps, which spreads to his surgical area, and "the whole area actually will go completely numb after about 10 minutes." Tr. 71. He has to stand up to get the blood flowing again. Tr. 71. It takes about 5 minutes for the blood to start flowing again and he spends about half the day lying in bed. Tr. 71. If he stands for more than an hour his

7

      left foot swells from his "failed back surgery." Tr. 72. His left leg seems to get a lot of blood clots. Tr. 72. He has difficulty sleeping due to pain. Tr. 73.

- When asked whether he had difficulty from a physical standpoint meeting with his caseworkers and going to court, he answered, "not really." Tr. 74.

The ALJ confirmed with the VE that Gomori had past work as a cable technical installation and repair worker. Tr.77. The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Gomori could perform his past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 77-78. The VE answered that such an individual could not perform Gomori's past work but could perform the following representative jobs in the economy: office helper, mailroom clerk, and cafeteria attendant. Tr. 78-79.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594

8

F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Gomori was insured on the earliest possible disability onset date, August 21, 2018, and remained insured through December 31, 2023, his date last insured ("DLI."). Tr. 14. Therefore, in order to be entitled to POD and DIB, he must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

9

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since August 21, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: post-laminectomy syndrome of the lumbar spine with degenerative disc disease spondylosis, foraminal stenosis, disc protrusions, and radiculopathy, now "status post" (s/p) May 2019 fusion and other surgeries, and with subsequent compression fracture of a vertebra; obesity; and depressive disorder, bipolar disorder, and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except that he is further limited in the following nonexertional respects:
—Can never climb ladders, ropes, or scaffolds but can occasionally climb ramp/stairs; can occasionally stoop, crouch, and crawl; and can frequently kneel and balance;
—Must avoid concentrated exposure to extreme cold and to vibrations, and must avoid all exposure to hazards such as unprotected heights and moving mechanical parts; and
—Can perform only simple, routine, and repetitive tasks but cannot perform tasks that would require a high production rate pace, such as assembly line work; requires a more solitary position, "more solitary" defined as one having no more than occasional interactions with supervisors and with a small group of familiar coworkers and having no more than incidental interaction with the general public, and is limited to superficial contact with others, "superficial" defined as no customer service tasks, sales, arbitration, negotiation, conflict resolution or confrontation, group or tandem or collaborative tasks, or management, direction, or persuasion of others; and can respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March **, 1980 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 21, 2018, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 16-42.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a

11

different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Gomori argues that the ALJ's RFC assessment is not supported by substantial evidence because

the ALJ relied on the state agency reviewers' opinions, which were not based on the entire record. Doc. No. 13, p. 11. But it is not error for the ALJ to rely on state agency reviewers' opinions based on an incomplete record so long as the ALJ considered the later evidence. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) ("Even if [the State agency physician's] RFC was completed without knowledge of these [medical] issues, however, the record reflects that the ALJ considered them."); *Minyard v. Berryhill*, 2019 WL 1099552, at *5 (N.D. Ohio Mar. 8, 2019) ("[i]t is clear from the ALJ's discussion of the evidence in the decision that it was known that medical evidence existed that post-dated the opinion evidence and that the ALJ considered the opinion evidence with that evidence in mind."); *c.f. Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (finding error when the ALJ relied on state agency reviewers' opinions without considering over 300 pages of records that post-dated those opinions).

Here, the ALJ gave a thorough recitation of the later medical evidence:[3]

In March 2019, Mr. Gomori attended a consult for the ongoing back and now bilateral leg pain with his neurosurgeon from years earlier, Kene Ugokwe, M.D. (Ex. 11F/2). Dr. Ugokwe noted that, in the interim after the prior laminectomy surgery, MRI had shown recurrent and severe bilateral foraminal stenosis at the surgical levels, and the pain and other symptoms failed to resolve with epidural injections and physical therapy. He recommended posterior lumbar interbody fusion at L4 through S1 to adequately decompress the affected nerve roots and "aggressive" facetectomies.

On May 23, 2019, Dr. Ugokwe performed the surgery consisting of segmental arthrodesis and fusion from L4 through S1 using bilateral pedicle screws and allograft, interbody fusion with disc spacers, and medial facetectomy, foraminotomy, and discectomy procedures at L4-L5 and L5-S1 (Ex. 13F/15-16,22-24). Other than a postoperative complication of swelling in the left leg a few days after the surgery, with venous ultrasound study in the emergency room returning negative for deep venous thrombosis or other abnormalities (Ex. 13F/42-47), Mr. Gomori had a typical immediate postoperative healing period and was instructed to lift no more than 10 pounds, to refrain from bending or twisting, and to wear a back brace when upright.

---

[3] In his reply brief, Gomori argues that Defendant's assertion that the ALJ "'carefully set forth Plaintiff's treatment history' and generally 'thoroughly reviewed the evidence' from 2018 through 2020," is "irrelevant." Doc. No. 16, p. 1. It is not irrelevant. *See, e.g., Ealy*, 594 F.3d at 513. Thus, to the extent Gomori urges the Court to adopt a *per se* rule that the ALJ may not rely on state agency opinion evidence that pre-dates later evidence, such a rule is contrary to binding precedent. *See id*.

13

Unfortunately, in early August 2019, Mr. Gomori fell when in the shower and went to the emergency room with increased back pain, and a CT scan of the lumbar spine revealed a new compression fracture of the superior L2 endplate (Ex. 9F/1,2-3). A next-day return visit to Dr. Ugokwe notes, for the first relevant time, that he presented with a walker to support ambulating and received a prescription for a "hard" ("TLSO") back brace (Ex. 11F/8). Upright x-rays of the lumbar spine done on October 16, 2019 showed moderate degenerative changes at the T12-L1 and L1-L2 disc levels (Ex. 12F/22).

In summary of this longitudinal treatment over the past two years, the claimant was experiencing an increase in chronic back pain and leg symptoms around the time of the alleged onset date, which ultimately persisted after injections and a reported course of physical therapy for several months and resulted in fusion surgery in May 2019. While such evidence is partially consistent with some aspects of his allegedly ongoing back pain and functional limitations particularly in bending, twisting, other postural movements of the body, and lifting or carrying, the objective medical signs from his neurosurgeon both prior to and after the May 2019 surgery and after the August 2019 fall and consequent compression fracture to L2 are not consistent with any significant limitations in standing or walking abilities or in the ability to sit for continuous periods. For, Dr. Ugokwe observed in March 2019 return visit and in May 22, 2019 preoperative screening full 5/5 muscle strength in the lower extremities, no atrophy in the legs, intact sensation to light touch and to pinprick, 2+ and symmetric reflexes in the legs, and normal gait (Ex. 11F/2; 13F/19). Other physicians also recorded normal gait prior to the surgery (Ex. 7F/3; 1F/12; 6F/4). At the time of discharge from the hospital in May 2019, in June 2019 outpatient follow-up, and even in August and October 2019 follow-ups after the compression fracture, Dr. Ugokwe still observed full 5/5 strength and no sensation deficits in the extremities that would be consistent with significant radicular symptoms or numbness (Ex. 13F/16; 11F/6,8,10,12). He has had normal gait and station per other medical sources as of March 2020 (Ex. 14F/15).

Additionally, postoperative x-rays of the lumbar spine done on May 27, June 20, and October 16, 2019 and a May 27, 2019 CT scan of the lumbar spine have shown intact fusion and hardware at the L4 through S1 levels, with no residual foraminal stenosis or anything beyond postsurgical changes at those levels (Ex. 12F/12,20,22,14-15). No more than mild foraminal narrowing, mild to moderate canal stenosis, and mild degenerative disc and facet joint changes were observed at the adjacent L3-L4 and L2-L3 disc levels on those studies, which had no Signiant loss of vertebral-body heights. The medical signs and the postoperative diagnostic imaging studies do not suggest any residual radicular pain or numbness down either lower extremity that would result in any significant limitations in standing or walking abilities, less in any medically necessary use of a walker to assist with those abilities over the course of an eight-hour workday.

Additionally, the claimant has denied leg pain and any new radicular pain or weakness at the several outpatient follow-up visits with his neurosurgeon after the May 2019 surgery (Ex. 11F/6,8,10). He denied taking any medications as of the October 2019 follow-up, and his testimony conveys that this has been the case ever since due to criminal issues discussed below. During a three-month incarceration for such issues in October 2019-January 2020, he did receive a "lower bunk" restriction expressly for his back condition, requested a double mattress for comfort when sleeping, was wearing the back brace, and received ibuprofen and/or meloxicam for managing pain (Ex. 15F/34,9,8).

>The medical evidence does not support that Dr. Ugokwe suggested that, as stated in testimony at the hearing, he might now require a total lumbar fusion due to the pain and compression fracture at L2, from at least that level all the day down to S1, which would presumably immobilize the lower half of his back and spine. Instead, it reflects no significant strength or neurological signs shown on physical examinations even before the May 2019 surgery, stable findings on postoperative x-rays and CT scans at fused L4-S1 levels without any evidence of ongoing or new nerve-root involvement or foraminal or other stenosis that would reasonably be causing any continuing radicular pain and numbness down the lower extremities, and consistent subjective reports of no further leg pain with some focal back pain from the L2 vertebral fracture. The foregoing medical evidence does not support the alleged intensity and persistence of pain that would effectively limit in any way continuous standing, walking, and sitting abilities each for about six total hours of an eight-hour workday and for about two hours before taking a scheduled rest break. However, it is partially consistent with the claimant's alleged lifting limitations to the regulatory range of light work—i.e., 10 pounds frequently, no more than 20 pounds occasionally—and with occasional abilities to bend whether by stooping or by crouching, crawling, and climbing ramps and stairs; with greater abilities for balancing and kneeling on a frequent basis; with avoiding concentrated exposure to extreme cold and to vibrations; and with never climbing ladders or ropes or scaffolds and similarly avoiding all exposure to unusual workplace hazards such as unprotected heights or moving mechanical parts.

Tr. 26-27. Then the ALJ discussed the opinion evidence:

>The State agency medical consultants' shared findings are mostly persuasive. They did not consider the claimant's obesity, and they lacked some substantial medical evidence consisting of all 2018-2019 diagnostic imaging studies of the lumbar spine, the May 2019 surgery, and the August 2019 fall injury with fractured L2 vertebral body (see generally Ex. 8F, 9F, 11F-13F). With these factors considered, I have adjusted and found more limitations in postural positionings and environmental tolerances for workplace hazards, vibrations, and extreme cold temperatures. However, other than those nonexertional respects, Drs. Lewis and Congbalay conducted a thorough review of the available medical evidence through January 2019 and, in doing so, considered both positive factors for the claimant relating to recurrence of low back pain and left-sided leg pain after the 2015 laminectomy surgery and medical signs for normal strength and normal sensation in the lower extremities and normal gait with unassisted ambulation (Ex. 1A/8-9; 5A/9-10). With my foregoing analysis taken into account, those key supports from the available evidence remain consistent with the additional medical evidence adduced at the hearing level of these applications, including the stable x-ray findings after the May 2019 surgery that do not account for any residual or new foraminal stenosis or nerve-root encroachment as causing any ongoing radicular pain down either leg, Dr. Ugokwe's findings of full 5/5 strength in the legs in all 2019 office notes including prior to that surgery and after the August 2019 fall and consequent L2 compression fracture, and the claimant's own reports of no further leg pain or radicular pain. Thus, I find these assessments including the finding of residual functional capacity for a range of light work to be mostly persuasive because they were sufficiently well supported by the available medical evidence and because they remain consistent with the substantial volume of additional evidence produced at the hearing level.

15

Tr. 34.

In support of his argument that the ALJ erred by relying on outdated opinion evidence, Gomori relies on *Childs v. Comm'r of Soc. Sec.*, 2016 WL 8671202 (E.D. Mich. Aug. 5, 2016). He submits that in *Childs*, the later evidence that had not been considered by the state agency reviewers showed that the claimant's "existing impairments continued to worsen, while new conditions developed[.]" Doc. No. 13, p. 12. But in *Childs*, the state agency reviewers had not considered evidence showing that the claimant had had a misdiagnosis and the following new diagnoses causing severe symptoms: obstructive lung disease, malignant thyroid cancer resulting in extensive neck surgery, multiple hospitalizations from appendicitis and attendant post-abdominal surgical complications, and diffuse pain syndrome. *Id*. at *6-7. Here, the challenged evidence not considered by the state agency reviewers was limited to the development of Gomori's spinal impairment, and the ALJ stated, with accuracy, that imaging and objective exam findings that post-dated the state agency reviewers' opinions and pre-dated Gomori's fall remained the same or had improved. The ALJ stated, with accuracy, that imaging of Gomori's spine after his fall showed a compression fracture but that his objective exam findings remained the same. Indeed, Gomori had testified that his symptoms after his fall were "really the same," other than the pain "kinda goes upward in my back." Tr. 64. Thus, unlike in *Childs*, the evidence does not show that Gomori's condition continued to worsen or that new conditions developed that caused severe symptoms.

In addition, the *Childs* court found that the ALJ "minimalized or mischaracterized" that later evidence:

> For example, the ALJ twice referenced Dr. Tilli's note, in February 2012, that Childs was "doing well" from a cardiac standpoint (Tr. 24, 27) in support of his conclusion that her coronary artery disease was not severe, despite the fact that she required a second cardiac catheterization and re-stenting just over one month later. Similarly, the ALJ observed that Childs "required little treatment after April 2012" for her coronary artery disease (Tr. 27), but ignored or minimized evidence that she continued to report chest pain, difficulty breathing with exertion, and fatigue, as well as evidence of a mildly enlarged heart, nodular opacities in both lungs, and mild obstructive lung disease. (Tr. 960-62, 981-82, 1032, 1091). Likewise, in finding that Childs is

16

> capable of frequent pushing and pulling and handling bilaterally, as well as occasional climbing of ladders, ropes, and scaffolds, the ALJ found that "there is no indication of significant recent treatment for shoulder pain since 2008." (Tr. 28). Again, this misconstrues the medical evidence, which shows that Childs had decreased range of motion in both upper extremities and was taking oxymorphone for pain. (Tr. 921-22, 938). Finally, the ALJ found "no indication of limitations from thyroid cancer" (Tr. 19), despite the fact that Childs underwent extensive neck surgery (including a total thyroidectomy), "continued to struggle with significant fatigue" in the months following this surgery, developed hematuria and underwent two cystoscopies because urine cytology suggested possible abnormal cells, and endured concern about "possible bladder carcinoma." (Tr. 1041-42). The medical evidence also indicates that Childs was consistently suffering from shortness of breath, fatigue, and psychological distress, resulting at least partly from her thyroid cancer diagnosis and treatment.

2016 WL 8671202 at *7.

Here, in contrast, the ALJ did not ignore, mischaracterize, or minimize evidence. Gomori argues that he had testified at the hearing that his fall in August 2019 caused "new mid-back pain" (Doc. No. 13, p. 14), but the ALJ discussed his fall, his x-rays showing a compression fracture at L2 and moderate degenerative changes, and focal vertebrae pain. Tr. 26-27. The ALJ explained that he still had full strength and no sensation deficits in his extremities, supporting a finding that he could perform light work with additional postural limitations. Tr. 26-27. Gomori complains that the ALJ noted his reports of "no further leg pain," but contends that he had testified at the hearing that "his radicular pain was limited to the left side, down into the tip of his toes." Doc. No. 13, p. 15. First, the ALJ found that Gomori's statements regarding the intensity, persistence, and functionally limiting effects of pain and other symptoms were "no more than partially consistent with the medical evidence and other evidence in the record" (Tr. 33), a finding that Gomori does not challenge. Next, the ALJ's statement that Gomori did not report leg pain at three post-surgical follow-up visits at Dr. Ugokwe's office, two of which occurred after his fall, is accurate. Tr. 27, 538, 540, 542.

Gomori also relies on *Falkosky v. Comm'r of Soc. Sec.*, 2020 WL 5423967 (N.D. Oh. Sept. 10, 2020) and *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 (N.D. Oh. Oct. 21, 2011), but his reliance is misplaced. Doc. No. 13, p. 13; Doc. No. 16, p. 2. In *Falkosky* there were no medical opinions at all—

17

the state agency reviewers found that there was insufficient evidence to form an opinion as to how the claimant's impairment impacted his functional abilities. *Id*. at *4. The claimant had "a limited treatment record" and the court stated, "This case would be different had the ALJ cited medical records demonstrating Falkosky's functional abilities." *Id*. at *8. Here, the state agency reviewers provided opinions regarding Gomori's functional abilities, which the ALJ cited, and the treatment record was extensive. In *Kizys*, an ALJ assessed an RFC "without the benefit of any medical source opinion as to work-related limitations whatsoever." 2011 WL 5024866, at *1. That is not the situation here. Thus, *Falkosky* and *Kizys* do not support Gomori's position in this case.

In sum, the undersigned finds that the ALJ considered the later evidence and provided reasons for the limitations in his RFC assessment that are supported by substantial evidence in the record.

Finally, Gomori argues that an ALJ has a duty to develop the record and asserts, "The ALJ should have sought to develop the record considering the newer developments in Plaintiff's case including Plaintiff's fusion surgery and new spinal fracture." Doc. No. 13, p. 15. However, Gomori concedes that the ALJ has discretion to determine whether additional evidence is warranted. Doc. No. 16, p. 3. To support his argument that the ALJ should have exercised that discretion in this case, Gomori relies upon *Falkosky*, but that case is not on point, as described above. He also relies upon *Ward v. Comm'r of Soc. Sec.*, 198 F.Supp.3d 825 (S.D. Ohio 2016), which does not support his argument either. In *Ward*, there was evidence of a qualifying, comparable IQ score in the record and, at the hearing, the claimant's attorney asked the ALJ to order additional testing if the ALJ did not believe that that comparable score was sufficient to meet a listing requirement. *Id*. at 830-831. The ALJ did not order additional testing and found that the claimant did not have a qualifying IQ score. *Id*. at 831. The court reversed and instructed the ALJ to order additional testing. *Id*. at 832. Here, Gomori does not identify comparable evidence in the record indicating that his condition satisfies a listing and his

attorney did not ask the ALJ to obtain additional testing or opinion evidence. Thus, the undersigned finds that Gomori has not shown that the ALJ failed to develop the record in this case.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: March 25, 2022  *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).**